IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 4, 2005 Session

## BEVERLY HEALTHCARE BRANDYWOOD v.
## BETTY L. GAMMON, ET AL.

Appeal from the Circuit Court for Sumner County
No. 24009-C    C. L. Rogers, Judge

No. M2003-03117-COA-R3-CV - Filed August 18, 2005

Nursing home brought suit against former resident's daughters seeking to recover amounts owed for resident's care by setting aside alleged fraudulent conveyances to the daughters. We affirm the judgment of the trial court setting aside a portion of the conveyances as fraudulent.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

John Ray Phillips, Jr., Thomas J. Martin, Jr., Gallatin, Tennessee, for the appellants, Betty L. Gammon, et al.

Joseph P. Rusnak, Nashville, Tennessee, for the appellee, Beverly Healthcare Brandywood.

### OPINION

Charles Rufus Leath was admitted to a nursing home facility, Brandywood, operated by Beverly Healthcare ("Beverly Healthcare") on February 28, 1997. Mr. Leath was approved for Medicaid nursing home benefits on April 8, 1997, because his assets did not exceed Two Thousand Dollars ($2,000). Pursuant to Medicaid guidelines, Mr. Leath's home was exempted from calculation of his assets for eligibility purposes because he intended to return to it. Mr. Leath's sole income was Five Hundred Dollars ($500) per month that he received from social security. If he had been a private pay patient at Brandywood, his monthly charge would have been approximately Four Thousand Dollars ($4,000) per month, but due to Medicaid participation, his portion was only Four Hundred Ninety Two Dollars ($492) per month. Mr. Leath's daughter, Betty Gammon, had his power of attorney and took care of her father's financial affairs.

Mr. Leath's family met attorney Tim Tackus when he addressed a group of family members at Brandywood about elder law issues. Mr. Tackus was retained by the family to advise on handling Mr. Leath's financial affairs. Based upon the advice of Mr. Tackus, Mr. Leath sold his home to his daughter, Betty Gammon, for $69,000, on September 30, 1999. It is not disputed that this figure represented the fair market value of the house. Ms. Gammon executed the documents on behalf of her father using the power of attorney. Shortly after the sale, in November of 1999, Ms. Gammon distributed part of the proceeds from the house sale to Mr. Leath's three daughters. Ms. Gammon was given $15,000 towards payment on her vehicle, and daughters Ms. Nancy Maxey and Ms. Lucille Smith were given $6,250 each. These transfers were simply gifts. In addition, at approximately the same time, the three daughters entered into a "Service and Life Care Agreement" drafted by Mr. Tackus whereby they agreed to perform certain services for their father for payment of $5,000 each. None of these transactions was done secretly, and all were documented.[1]

In February of 2000, Mr. Leath was found ineligible for Medicaid nursing home benefits because the sale of his house put his worth over the $2,000 asset limit. The Department of Human Services ("DHS") determined that the transfers of assets totaling $42,500 to his daughters were improper and imposed an ineligibility period. Administrative appeals affirmed this decision. Mr. Leath pursued judicial review, and the Chancery Court of Davidson County affirmed DHS's decision to deny Mr. Leath's benefits on the basis he had transferred assets for less than fair market value.[2] As a result, Mr. Leath was declared ineligible for Medicaid benefits from October of 1999 through December 2000.[3]

Mr. Leath continued to stay at the Brandywood facility until he was discharged on June 25, 2001, apparently because of unpaid amounts Beverly Healthcare claimed he owed. Beverly Healthcare obtained a judgment against Mr. Leath for $16,972.45 in Sumner County General Sessions Court on August 2, 2001.[4] Mr. Leath died on August 14, 2001.

During the 16 month period of ineligibility, Mr. Leath was responsible to Beverly Healthcare for approximately Four Thousand Dollars ($4,000) per month. The record shows that Beverly Healthcare received payment from Mr. Leath or his daughters for thirteen of the sixteen month ineligibility period. The daughters used the money obtained from their father as well as probably

---

[1] Whether Ms. Gammon exceeded the authority granted in the power of attorney was not raised by Beverly Healthcare as a ground to void the transactions.

[2] It appears from the record that Mr. Leath and his daughters never challenged DHS's decision that the gifts to Ms. Smith and Ms. Maxey were improper. Medicaid guidelines address arrangements such as that created in the Service and Life Care Agreements. The court affirmed the Department's determination that the Leath agreement did not meet the requirements that would keep Mr. Leath eligible for benefits.

[3] DHS used a formula based on the private pay nursing home rate to arrive at a period of 16 months totaling $42,500, the total amount transferred to the daughters.

[4] The General Sessions judgment was for $16,972.45, which represented $12,972.45 in amounts past due and $4,000 in attorney's fees.

their own money to provide for their father's needs. The Executive Director of Brandywood testified at the trial of this matter that the only balances past due for Mr. Leath's care were for October ($3,300), November ($3,291.68) and December ($3,298.60) of 2000.[5]

Beverly Healthcare was unable to collect this judgment from Mr. Leath or his estate. It then initiated the proceedings that are the subject of this appeal on March 27, 2003 seeking to recover the amount of the General Sessions judgment from Mr. Leath's daughters on the basis the transfers to them in 1999 were fraudulent. The complaint alleged that Mr. Leath had been admitted to the nursing home pursuant to a written agreement; that he failed to pay all the amounts due under that agreement; that a judgment had been obtained against him for amounts due under the agreement; that prior to entry of the judgment Mr. Leath had transferred virtually all his assets to his daughters; that Mr. Leath had no other property to satisfy the judgment; and that the transfers were made for the purpose of defrauding Beverly Healthcare and other creditors, were made for the purpose of obtaining Medicaid nursing home benefits, were made without fair consideration and rendered Mr. Leath insolvent, and were made at a time when Mr. Leath intended or believed that debts would accrue beyond his ability to pay as they matured. Beverly Healthcare asked that the transfers be voided, the property transferred be declared subject to the judgment, and for a judgment against the daughters for the value of the property transferred or the amount of General Sessions Court judgment, whichever was less.

After a trial on the merits without a jury, the trial court found that the transfers to the three daughters constituted fraudulent conveyances under applicable law, holding:

> The transfers were made without a fair consideration and rendered Mr. Leath insolvent. The Court specifically finds that the defendants embarked upon a design, not of their own making, but a design developed by a professional that they relied upon, in order to protect their father's assets. The defendants were reluctant to lose all of their father's assets to legitimate creditors such as a nursing home or Medicare and not have anything left over to take care of the final needs of their father and perhaps nothing to be disbursed among themselves.

> Ms. Lucille Smith testified at trial that the transfers at issue constituted her father's money and that it was there to take care of him to the end of his life.

> The Court finds that the transfers of $20,000 to Ms. Gammon, $11,250 to Ms. Smith, and $11,250 to Ms. Maxey were supported by no consideration whatsoever.

---

[5]There is no clear explanation in the record why Beverly Healthcare obtained a judgment for $12,972.45 in the August 2001 General Sessions order for past due amounts, yet in testimony at trial Beverly Healthcare only claimed it was owed $9,891.92. At oral argument Beverly Healthcare's attorney told the court he believed the reduction was caused by amounts Beverly Healthcare received from Medicaid reimbursement. In any event, Beverly Healthcare did not appeal the amount it was awarded in this action, $9,891.92.

The Court also finds that the transfers rendered Mr. Leath insolvent. At the time the transfers were made, Beverly Healthcare was a creditor of Mr. Leath's and was going to be a creditor both actually and in contingent liability from the date of his admission in February 1997 until the date of his discharge from Beverly Healthcare Brandywood in June 2001. The transfers left Mr. Leath with an insufficient amount to pay the probable liability on his existing debts as they became absolute and matured.

The Court also finds evidence of several badges of fraud connected to the transfers: (i) the relationship of the parties; (ii) the fact that virtually all of Mr. Leath's property was given away in a span of some forty days; (iii) the precarious financial position of Mr. Leath; and (iv) the denial of Medicaid benefits. These badges of fraud create a conclusive presumption of fraud and shift the burden of going forward on the defendants. The defendants failed to offer any innocent purpose for the transfers. The only apparent purpose for the transfers was to somehow have Medicare pay for all of their father's care without having to consume any of their father's assets.

In its Amended Final Order, the trial court found the daughters liable for the three (3) months of unpaid Beverly Healthcare bills totaling Nine Thousand Eight Hundred Ninety One Dollars and Ninety-Two Cents ($9,891.92).[6] The judgment was allocated among the daughters according to the percentage of the assets each received.[7] Ms. Gammon was responsible for Four Thousand Seven Hundred Forty-Eight Dollars and Twelve Cents ($4,748.12), Ms. Smith and Ms. Maxey each responsible for Two Thousand Five Hundred Seventy-One Dollars and Ninety Cents ($2,571.90). The trial court awarded Beverly Healthcare attorney's fees of Seven Thousand Dollars ($7,000) and discretionary costs of Six Hundred Seventy Dollars ($670). Ms. Smith paid the judgment entered against her. Ms. Gammon and Ms. Maxey filed this appeal.

## I. STANDARD OF REVIEW

We review this case *de novo* on the record with a presumption of correctness of the trial court's findings of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Brooks v. Brooks*, 992 S.W.2d 403, 404 (Tenn. 1999). No presumption of correctness attaches to the trial court's decisions regarding questions of law. *Wilson v. Wilson*, 984 S.W.2d 898, 900 (Tenn. 1998), *cert. den.*; *Oakley v. Wilson*, 528 U.S. 822, 120 S.Ct. 68, 145 L. Ed.2d 59 (1999).

---

[6] The original judgment in this case was for $15,032, presumably roughly equivalent to the General Sessions judgment amount Beverly Healthcare was trying to collect from the daughters which included attorney's fees incurred to obtain the General Sessions judgment. The daughters moved to amend the judgment to comply with the evidence as to the amount owed. The court granted the motion and filed an amended order.

[7] The trial court did not attempt to ascertain whether the amounts due from each daughter should be redistributed based upon amounts they paid Beverly Healthcare for their father's care. The distribution of liability among the daughters was not appealed.

## II. FRAUDULENT CONVEYANCE

## A. Existing Debt

Beverly Healthcare argues, and the trial court found, that the conveyances to Mr. Leath's three daughters rendered him insolvent, thus invoking Tenn. Code Ann. § 66-3-305 as it existed at the time of the conveyance in 1999.[8]

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to such person's actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

Tenn. Code Ann. § 66-3-305 (Supp. 1999) (repealed 2003).

In determining whether Tenn. Code Ann. § 66-3-305 (Supp. 1999) (repealed 2003) is applicable, we must first determine whether the transfers made Mr. Leath "insolvent" as that term is used in the statute.

According to Tenn. Code Ann. § 66-3-302 (Supp. 1999) (repealed 2003), a person is insolvent "when the present fair salable value of that person's assets is less than the amount that will be required to pay the probable liability on such person's existing debts as they become absolute and matured." Due to the use of the word, "existing", the debts that are used to test for insolvency under Tenn. Code Ann. § 66-3-305 (Supp. 1999) (repealed 2003) are debts in existence when the conveyance is made. *Crocker v. Ryan*, 914 S.W.2d 551, 553 (Tenn. Ct. App. 1995). While the debt may be due and payable later, the debt itself must exist at the time of the conveyance. *Id*. The intent of the grantor is irrelevant if the transfer renders the person insolvent.

In this case, the record shows that after the conveyances to his daughters, Mr. Leath had Fourteen Thousand Dollars ($14,000) in his checking account and an income of Five Hundred Dollars ($500) per month from social security. According to the agreement Mr. Leath signed with Beverly Healthcare, while he was covered by Medicaid he was liable to Beverly Healthcare for Four Hundred Ninety-Two Dollars ($492) for his care. The unpaid amounts Beverly Healthcare filed suit to recover were for his care for October, November and December of 2000 totaling Nine Thousand Eight Hundred Ninety-One Dollars and Ninety-Two Cents ($9,891.92). Obviously, the debts were not in existence in November of 1999, at the time of the conveyances, since the services had not been rendered to Mr. Leath. There was no evidence of a debt owed by Mr. Leath to Beverly Healthcare or any other creditor in November of 1999. Therefore, since Mr. Leath was not rendered insolvent

---

[8] In 2003, the legislature repealed Tenn. Code Ann. § 66-3-305 and many of the other statutes governing fraudulent conveyances and enacted a new statutory scheme based upon the Uniform Fraudulent Transfer Act. We will, of course, recognize and apply statutes that were in effect at the time of the conveyance.

by the transfer, they are not fraudulent under Tenn. Code Ann. § 66-3-305 (Supp. 1999)(repealed 2003).

## B. Future Creditors

Whether Beverly Healthcare can set aside the conveyances because it was a future creditor of Mr. Leath requires an element of intent by the transferor and is governed by other sections of the code as they existed in 1999. In order to be fraudulent under Tenn. Code Ann. § 66-3-307 (Supp. 1999) (repealed 2003), the transferor must have a belief that future debts will exceed the transferor's ability to pay. *Crocker*, 914 S.W.2d at 554.

> Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that debts will accrue beyond the party's ability to pay as they mature, is fraudulent as to both present and future creditors.

Tenn Code Ann. § 66-3-307 (Supp. 1999) (repealed 2003).

Similarly, in order to be fraudulent under Tenn. Code Ann. § 66-3-308 (Supp. 1999) (repealed 2003), an actual intent to hinder, delay or defraud present or future creditors is required. *Id*.

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud, either present or future creditors, is fraudulent as to both present and future creditors.

Tenn Code Ann. § 66-3-308 (Supp. 1999) (repealed 2003).

The trial court found that the transfers were not supported by consideration and that the only apparent purpose for the transfers was to protect Mr. Leath's assets so Medicaid would remain responsible to pay for his care. There were no serious arguments made that the gifts were supported by consideration.[9] While life expectancy is far from certain, the evidence presented to the trial court showed that it was anticipated Mr. Leath would remain at Brandywood for an undeterminable length of time since he did not have an immediately life threatening condition. The sale of his house made him ineligible for Medicaid and increased his monthly obligation to Brandywood. In that situation, it was to be anticipated that the amounts owed Brandywood would exceed Mr. Leath's assets under Tenn. Code Ann. § 66-3-307 (Supp. 1999) (repealed 2003). Furthermore, transfers without consideration with the intent to require Medicaid to be responsible would be prohibited under Tenn. Code Ann. § 66-3-308 (Supp. 1999) (repealed 2003).

---

[9] Because the amount owed Brandywood and awarded by the trial court is less than the total of the outright gifts to the daughters ($27,500), it is not necessary for us to consider the issues raised in connection with the Service and Life Care Agreement, including whether the payments thereunder were made without consideration.

The trial court had ample evidence to find the gifts totaling Twenty-Seven Thousand Five Hundred Dollars ($27,500) were not supported by consideration and that they were fraudulent under both Tenn. Code Ann. § 66-3-307 (Supp. 1999) (repealed 2003) and Tenn. Code Ann. § 66-3-308 (Supp. 1999) (repealed 2003). For that reason, we affirm the finding of the trial court finding these gifts to be fraudulent conveyances.

## ATTORNEY'S FEES

The trial court awarded Beverly Healthcare its attorney's fees both for this action and the attorney's fees it incurred in the General Sessions action against Mr. Leath for a total of Seven Thousand Dollars ($7,000).[10] The daughters argue that the court had no authority to award Beverly Healthcare attorney's fees against them. Beverly Healthcare argues, on the other hand, that the Agreement between Beverly Healthcare and Mr. Leath authorizes such an award of attorney's fees.

It is well settled that Tennessee follows the American rule which provides that in the absence of a statute or an agreement between the parties providing otherwise, each party must bear his or her own litigation expenses, including attorney's fees. *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998).

The provision governing attorney's fees in Beverly Healthcare's Agreement with Mr. Leath provides as follows:

> In the event the Facility institutes and is a prevailing party in litigation against any party to this Agreement, arising from that party's failure to comply with the terms of the Agreement, the Facility shall be entitled to receive from the losing party reasonable attorney's/collection agency fees.

The court awarded Beverly Healthcare attorney's fees incurred in both the General Sessions lawsuit against Mr. Leath and this action against the daughters since it was the prevailing party. The trial court's order did not specify how the Seven Thousand Dollar award was split between the lawsuits. Beverly Healthcare is entitled to recover money from Mr. Leath's daughters to pay the attorney's fees incurred in the General Sessions matter. The contract provision clearly allows award of such fees.

We believe the real issue is whether the contract provision entitles Beverly Healthcare to recover attorney's fees not just in litigation against Mr. Leath but also in litigation to collect the judgment. The contract contemplates that a party defaulting in payment is liable for costs of collection, including collection agency and attorney fees. The case before us was instituted to collect monies owed by Mr. Leath and was necessitated by the transfers to the defendants herein. Therefore, payment of Beverly Healthcare's attorney's fees incurred in this matter was a contractual obligation

---

[10]In its complaint, Beverly Healthcare sought to recover from the daughters the amount of the General Sessions judgment that included $4,000 in attorney's fees.

of Mr. Leath. Under the facts present herein, we conclude Beverly Healthcare was entitled to an award of fees it incurred in this action to set aside the conveyances made by its debtor.

For the foregoing reasons, we affirm the judgment of the trial court. Costs are assessed against defendants Betty Gammon and Nancy Maxey.

_____
PATRICIA J. COTTRELL, JUDGE